We will turn to the next case on our calendar. United States versus Pedro Gonzalez Coito Council. Morning Your Honors, Devin McLaughlin for Defendant Appellate Pedro Gonzalez. I hope you're well. I want to address the evidentiary errors warranting new trial. I want to start with the ruling barring the two witnesses who would have testified to Pedro's technological ineptness, which was offered to counter the government's argument that Pedro purposely turned off the recording device during the controlled delivery of the suitcase at Dunkin Donuts in December of 2017. The district court held in part that this error didn't, that this issue did not warrant new trial because that was just window dressing and irrelevant to the issues at the heart of the case. Respectfully, we take issue with that because the government itself made it a central issue. If you look at the government summation, starting at transcript page 357, they identified three points out of the gate that they believe support conviction and the controlled delivery is one of the three they rely upon, and then they go on at length later on in the summation to discuss it. Mr. McLaughlin, this is Judge Lynch. Could you help me out? As I understood the government's position, they're arguing that there was no technological competence necessary, that what Mr. Gonzalez was told was, don't take this out of your pocket, leave it there, and it'll just run. Instead, he's observed to take it out of his pocket and do something with it. Now, whether you need to be a wizard or just somebody who pushes an off button to turn it off at that point, why does that matter if the instruction was, and again, this is why I'm asking for help, am I misunderstanding the record? Is it not true that what his role vis-a-vis technology was, was to sit there quietly with his cell phone in his pocket and he didn't do it? The evidence in the record, Your Honor, supports the fact that he was actually instructed, apparently, to do two things with his phone. There's some evidence along the lines of what you just recited, which is keep the phone in your pocket. There was also evidence that he needed to be in communication with Walter Eureka in terms of his arrival time and the logistics of his arrival. Anticipating this question, if you look at transcript page 333 and also transcript page 325, that memorializes the fact that he was told by Agent Fraser, this is how you're going to be talking to Walter and tell Walter blank, blank, and blank. The notion that he was just going to have to sit there with a phone in his pocket when he also and frankly, from our perspective, explain why he was having to deal with his phone. As Your Honors are aware, the government makes the point that, well, this was a different application than the one that he was being challenged with in November, which the two witnesses would have testified to. Respectfully, if you're technologically challenged, you're technologically challenged. It's not app specific. If you have problems with it, you have problems with it. On this point, I sit there scratching my head because my client agreed to go ahead and participate in this control delivery and went through the steps necessary to do the control delivery. The notion that during the time of the control delivery would be the time that he would be trying to turn off his phone to say warning to Walter makes no sense. If he really didn't want to get Walter in trouble because he was consciousness of guilt, he would have communicated beforehand, don't show up at the meet. That's the easiest thing to do. Here, that isn't what happened. He participated in all the steps. Frankly, we think the truth is he didn't understand his phone and he doesn't understand how to do it. The government keeps talking about, well, it was so simple, so simple, so simple. When I look at Agent Frazier's testimony, Agent Frazier, transcript page 133, talks about it's preferable to lock your phone. I don't even know what locking my phone means. Given the common sense notion that I just articulated, that it really wouldn't make any sense that he would be trying to purposely turn off his phone, and the real explanation is being technologically challenged, which some of us are, the evidence of the two witnesses would have been critical, would have been extremely important to my client's case. The reality is that this was a close case. We know that because there was an Allen charged in the middle of the jury deliberations. From our perspective, keeping this critical part, one of the three prongs of the three-pronged stool the government used in closing, and keeping that from the jury was error, and in a close case was not harmless error, and warrants new trial. The second evidentiary issue that I wanted to discuss had to do with the 404B evidence in terms of prior trips with Judge Glasser finding that that was admissible under 404B because it went to knowledge or intent of Mr. Gonzales, Pedro. What I've been struggling with is this, which is obviously Pedro's defense was he was a blind mule. He didn't look in it. He didn't know what was in it, and I'm trying to figure out why him coming in two, three, four, five times is different than him coming in once in terms of what he would have known about what was inside the luggage. I guess I'll express it this way. If during prior trips, there was some additional indicia that showed that he knew or should have known that he was transporting cocaine, then I could- Mr. McLaughlin, excuse me. I'm not sure. Maybe I misunderstand again what the evidence is that you're objecting to. As I understand it, and again, correct me if I'm wrong, I didn't think this was evidence that, oh, his passport shows three prior trips. This was testimony by the cooperating witness that on three prior trips, he knowingly participated as he did this time, according to that witness, in bringing cocaine into the country. Isn't that what the evidence is? That is the evidence, Your Honor. It's the testimony by Joel Urique about prior trips where he transported cocaine into the country, but as- But the witness's testimony was that this was all part of a scheme and plot, that it was not an accident, and that was true for the whole scheme, not for just this one occasion. Isn't that what the testimony was? Yes, Your Honor. I'm not seeing that this is enormously valuable evidence for the government, because I also don't see how it's prejudicial, really, because it's all the same witness's credibility. If the jury believes that Joel Urique is telling the truth, then it convicts. If it thinks he's lying, then the fact that he said it happened three times rather than one, it doesn't make any deal in the case. Your Honor's point is well taken, because it does rely upon the same testimony by the same individual, and ultimately, obviously, the guilty verdict boiled down to a credibility decision regarding that individual. We are arguing about the prior instances because, to my mind, they're not logically relevant to whether my guy knew. If he didn't look in bag one first time and didn't look in bag one second time, how does the fact that he came in more than once elevate or add to the possibility that he knew when he came in this time on November 13th that he had something in the bag? But you are correct. There was no additional evidence other than that. Your Honor, I have two questions on this. One is, why wouldn't it be natural for the other conspirators not to, if there is this transaction, these transactions on multiple occasions, why isn't that evidence of his knowledge in the sense that they would never entrust these trips to somebody who wasn't taking it seriously and getting paid for it and knowing why it was done? Doesn't that tip on the scale of tending to prove knowledge on his part? That's my first question. The second is, why is this 404B? Isn't this all part of the same conspiracy? If it's all part of the same conspiracy, then it's not a prior wrongful act. It's just part of this act, part of this conspiracy. Your Honor, with regard to the notion that you wouldn't trust anybody to do this unless they were in on the game, so to speak, which was certainly testimony provided by a government agent in the case, that doesn't distinguish as to why you would let in the evidence of the prior trips. I mean, that's basically a global assertion that you don't let them ever do it. We couldn't contest that evidence with regard to the November 13 capture trip, but why that justifies letting in the prior trips, I again assert that the prior trips don't have further relevance because of that. That gets to my second point. My second evidence of prior activities prior to the day of the arrest, in furtherance of the conspiracy, is admitted to show the duration and scope and nature of the conspiracy. Your Honor, here the argument made below and repeated now by me is that, and I think the reason Judge Lasser didn't rely upon this being direct evidence of the conspiracy, is that the government chose to charge a very limited conspiracy. Their charge was on about November to December 2017, and there's no temporal evidence that establishes that any of the prior trips happened in November. There's nothing that shows that, and we submit that the government didn't put in sufficient direct evidence on the timing of the prior trips, which they could have, they just didn't, that would have supported allowing this in as direct evidence of the offense. Counsel, would you take a minute, although your time has expired, and speak about the safety valve? Thank you, Your Honor. So, with regard to the safety valve, I would like to point the court to what the judge actually found. So, Judge Lasser, in terms of trying to ascertain whether or not to go ahead and give my client or deny my client the safety valve, went ahead and found, and this is at appendix 33, page 10 of the sentencing transcript, that Pedro, Mr. Gonzalez, you knew or had a good reason to know that you were in fact knew, he found in the alternative, one of the alternatives, or had good reason to know. And frankly, that's consistent with what Pedro proffered at the post-verdict pre-sentencing proffer, which is, I had reason to know, I did this enough, you know, that I could know. And so, when we have a finding by the judge that, you know, had good reason to know is, frankly, consistent with Pedro not having met with Joel and Raul, not having done all those things. If he had actually done that, he would have known, and Judge Lasser didn't find that. And so, based on what Judge Lasser... Excuse me, didn't Judge Glasser also find that he basically told the authorities in the proffer session the same testimony that he gave at trial, which was false about his own involvement? He, on appendix 35, made the conclusion, he pretty much denied everything that was fairly obvious and testified to by witnesses who the jury clearly believed. So that was certainly something that Judge Glasser articulated. I don't know, I mean, I'm trying to reconcile the fact that his initial finding on 33 is you had good reason to know, understanding it was in the alternative, what he is referencing when later on in the sentencing transcript, he talks about pretty much denying everything. And... For example, didn't Mr. Gonzalez deny that he intentionally interfered with the telephone recording? He did, and he continued that. I mean, the denials he made at trial continued in his proffer session, which is he didn't purposely interfere with the recording, he did not... So when Judge Glasser says, you said the same thing you said at trial, and that was not true, why doesn't that cover that? I mean, again, I'm not... Whether he did or didn't tell the truth is not something that I'm in a position to judge, but Judge Glasser was, and Judge Glasser said he persisted in false testimony. I just don't know the sweep, Your Honor, and it's absolutely difficult. And I guess there's some question of whether additional inquiry should have been made by the judge at the sentencing in terms of what the factual findings were. But I see this very broad statement in terms of denied everything that was fairly obvious. I don't know what the other... All I do have is the specific finding that he knew and had good reason to know. And again, that's consistent with what he proffered to, and frankly, in part what he testified to, which is that he should have known, but he didn't have the specific knowledge with regard to the other things that the judge may or may not have relied upon in making that sweeping statement. Thank you, counsel. We'll hear from the government. You have reserved three minutes for rebuttal. Good morning, Your Honors. David Lizmay from the United States on appeal as well as below before the trial court. I'm going to address the evidentiary issues raised by the appellant, but I would like to note that these were also raised two times before the trial court in the trial following the appellant's conviction. So addressing first the trial court did not abuse its discretion in precluding the two witnesses, the prior counsel and the paralegal for the prior counsel for the appellant regarding the technological ineptness and his mental state with respect to the recording application placed on his phone for the control delivery. Your Honors, I think it's important to note that the trial court held that on relevance ground and because it would be misleading because obviously those witnesses had no knowledge of the recording application whatsoever. They were not at the control of delivery. And most importantly, as Your Honors noted, the instructions were in Spanish and in English three separate times to phone in his pocket. But aside from that, as we note in our brief, the ability to turn the application off is actually could be a sign of technological sophistication. As we noted, to turn the application off, you would have had to take your phone out. He would have had to open up the application, the recording application itself. He would have had to select the specific call that was recording, and then he would have had to click end the call and then exit the in order to do that process. And so those two witnesses, not only could they not speak to the specific application. I'm sorry, Your Honor. Counsel, is your point that he knew very well what he was doing with the phone? Your Honor, that's what we argued at trial. And that's, that's, we believe what the jury found as well. Just given the number of steps and given the times to tell him to come over to where he was sitting and tell him, do not touch your phone, do not access the application. And three times he continued to turn off the application. We felt that that, and the jury felt obviously that that was fairly clear that what he was doing was purposeful. This was not a one-time thing where you could chalk it up to an accident. Even then he would have had to go into the application and turn it off. This was three times that the law enforcement officers had to get up out of their positions, come to him, take the phone, restart the application, instruct him again in English and in Spanish, where he affirmed that he understood. And the way we know he understood, not only did he tell the agents this, but the defendant himself testified about his mental state and his understanding of the application. Now the government exhibit 97, we know that he testified that he, he understood the application. He understood the instruction and he understood that he was not to touch it. And so any testimony from, from Mr. Patton or Ms. Bass would have been irrelevant and the court properly precluded it. Uh, no, sir. And so that judge Walker. Yes. Yeah. After, after, after the last instruction by the agent, uh, not to turn off the phone, uh, was there any, was he under constant surveillance? Yes, he was your honor. Uh, was there any, uh, uh, effort on his part to, to make a phone call during that period of time? No, your honor. The, the, as, as the, as the record shows, he, he was, you know, what they saw, they never saw him pick up the phone and put it to his ear. Uh, the last time they actually just saw him get up and walk out of the Dunkin Donuts to which the law enforcement agents ran out after him and told him to get back inside. And so there was no, there was no, uh, seeing of a phone call. All they saw the first time was him fiddling with the phone. And then immediately upon that, they, they heard the audio cut out and thus they, they went over him and told him, don't touch your phone, leave it in your pocket. Do not do not bring it out. And this happened two more times. So I'm addressing this, I'm addressing this question to the argument that the other side made was that he needed to call uncle Walter, uh, to set up the timing and the meeting and so forth. And therefore that's why the phone was turned off. Uh, and he didn't turn it back on again for some reason. Your honor. Yes. And, and, and, you know, these operations are, are conducted, uh, with immense planning. And so the time and the place of the meeting was set, uh, uh, days before. And then again, the morning of they arrived at, and this is all brought out in testimony of special agent Fraser, they met at the local police department where they again confirmed the time and place of the appointment, uh, with Walter. So precisely for that reason, so that he would not have to, to take out his phone and make any phone calls and that he could, he could abide by the instructions that he very clearly understood. Uh, and again, you know, the defendant, the appellant himself testified that he understood, uh, and to his mental state. And so, again, we believe that any testimony, the trial court properly precluded any testimony from individuals who had no knowledge, uh, of this and would have, uh, would have been pure speculation and conjecture from them on the issue. And your honor. So, uh, uh, yeah. So, so, you know, again, we, as I said, uh, even if the court were to find error, it would be harmless again, because the dependent testified himself that he understood the instruction, uh, with respect to the second issue of the prior trips. Um, the, we again agree, you know, argue that the trial court did not abuse its discretion in preventing that testimony below the, the government argued yes, both on 404 B and direct evidence grounds that this information should come in. Uh, because Mr. Joel Yarlick, he had, we argued had direct knowledge of these prior trips again, because both the leader of the conspiracy Raul Moron and, uh, the appellant himself, uh, would contact Joel Yarlick to tell them when he was coming back from Peru to the United States with narcotics, both, both the leader of the conspiracy, uh, would contact him to indicate this, uh, when, when the appellant arrived in Peru. And then Mr. Gonzalez-Cueto would, uh, contact Joel Yarlick and his associates. Once he arrived back, uh, in the United States to arrange both the pickup of the narcotics and, uh, payment for, for transportation of narcotics from Peru back to the United States. And Joel Yarlick testified to this, that this happened between three to five occasions. Obviously the last occasion being the time that the, uh, appellant was arrested. Um, and so again, as, as your honors noted, we, we argued both for direct evidence and 404 B, uh, the record below in his trial court, uh, permitted as 404 B, but we argue that it should have been both evidence of the conspiracy, uh, direct evidence of the conspiracy as well. Uh, and, and lastly, your honors, the government will just touch on the safety valve issue. Uh, you know, I won't, uh, I won't beat a dead horse, but yes, Judge, Judge Glasser below, uh, did find that the defendant, uh, testified inconsistent and lied, which inconsistent with what was, as he quoted, fairly obvious from the record and what the jury, uh, counted as. And so it was the defendant's burden, uh, to, to, to meet and, and as, as Judge Glasser held, he did not do so. Uh, and so I know there was an additional evidentiary issue that was not addressed, uh, uh, by, by the appellant. Uh, but if there's no other questions from your honors, uh, I'll cede my time and, uh, and rest on a brief. Thank you, counsel. Uh, we will hear, uh, from counsel for, uh, Mr. Gonzalez three minutes. Thank you. So just briefly, um, when I listened to the government talk about what they profess to be, uh, a claim to be Mr. Gonzalez is, uh, aptitude, uh, with technology. Um, it reinforces, uh, for me, uh, that, uh, the fair defense to that was, uh, ineptness at technology. Um, and that, uh, frankly is the same argument that was made below. It's what opened the door, uh, to this. It's what queued, uh, defense counsel below to, uh, recognize the vital importance of it. And so, uh, uh, from our perspective, it just reinforces, uh, the relevance of this, uh, with regard to your question, judge Walker, in terms of, um, whether there's evidence that he actually received a call while sitting at Dunkin' Donuts. Uh, I agree with the government that there is not, but I am looking at, uh, transcript pages three, three, three, and three, three, four. And, um, uh, first of all, um, uh, Mr. Gonzalez indicates that, uh, he, uh, actually, uh, this juncture, uh, didn't understand some of the things agent Frazier was telling him because they didn't speak Spanish to me, but more importantly, he understood that he was the signal to the agents after Walter had called to let them know that he was on his way and whether Walter placed that call or whether Pedro had his phone there to receive the call, uh, and, and be able to receive the call. Um, uh, uh, both of them, um, uh, would have required, or at least in Pedro's mind, required handling the phone, which is ultimately what, uh, led to his downfall. Did he say, did he say that he did receive such a phone call and did signal the agents? No, no. And it's all right. I didn't mean to misrepresent that. So I'm agreeing with the government. There is no evidence that he received a call. I don't know if anybody actually testified to my assumption is that there were some calls that obviously got them to Dunkin' Donuts, but, uh, no, on page three, three, four, he only testified that he was the signal when, um, sorry, he was the signal after Walter called. And so, but if there's no evidence that that actually did happen, as opposed to that, that was something that conceivably could happen. I'm not sure how that goes to, uh, explaining why he would handle the phone. Um, my expectation is that if you're holding a phone, uh, sorry, if you're expecting a call, you would get the phone out of your pocket to be able to receive that call, which is the important call that you're waiting for and that they've, uh, engaged you to, uh, engage it. So, but that's all I have. Thank you. Thank you, council. Thank you both.